UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

MUSTAFA NUR,

    Plaintiff,

    v.                          CAUSE NO. 3:23-CV-512-JD

WILLIAM HYATTE, et al.,

    Defendants.

OPINION AND ORDER

Mustafa Nur, a prisoner without a lawyer, is proceeding in this case against Warden William Hyatte, Investigator Montrel McGee, and Disciplinary Hearing Officer ("DHO") Angel Goodridge "in their personal capacity for money damages for denying him due process in violation of the Fourteenth Amendment in connection with the disciplinary proceeding initiated on August 12, 2020[.]" ECF 35 at 6. The defendants filed a motion for summary judgment. ECF 56. Nur filed a response, and the defendants filed a reply. ECF 64, 65, 66. The summary judgment motion is now fully briefed and ripe for ruling.

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable [factfinder] could [find] for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To determine whether a genuine

issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). However, a party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in its own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

The defendants provide Nur's disciplinary hearing records and an affidavit from Investigator McGee, the Investigator with Internal Affairs/Division of Investigations and Intelligence at Miami Correctional Facility ("MCF"), which show the following facts: On August 12, 2020, Investigator McGee was in the staff shoeshine area getting a shoeshine from Nur when an inmate named Danny Perez dropped a laundry bag next to Nur. ECF 57-1 at 2. After Nur finished the shoeshine and left the room, Investigator McGee picked up the laundry bag, noticed it was heavier than anticipated, and opened the laundry bag to find a pillowcase containing tobacco and numerous cellphones. *Id.* Investigator McGee called Nur back into the room and asked him about the bag, and Nur denied knowing anything about the bag or its contents. *Id.* Investigator McGee took the laundry bag to the investigations office, photographed its contents, and placed it into a secure evidence locker. *Id.* Investigator McGee then interviewed Perez while other correctional officers searched Nur's cell and brought his possessions to the investigations office. *Id.* Investigator McGee searched Nur's property and found

another cell phone and six address books within Nur's mattress. *Id.* at 3. These items were also photographed and placed in a secure evidence locker. *Id.*

The next day, Investigator McGee continued his investigation into the trafficking and possession charges against Nur. ECF 57-1 at 3. Nur was moved to the administrative segregated housing unit pending the resolution of the investigation in order to cut off any potential trafficking from outside the prison until they could determine who was involved. *Id.* According to Nur, the cell where he was housed in the administrative segregated housing unit had poor lighting and was "covered in excrement and other bodily fluids unable to be identified." ECF 64-1 at 5. Investigator McGee attempted to speak with Nur on September 18, 2020, but Nur refused to speak with him. ECF 57-1 at 3. That same day, Investigator McGee issued two Reports of Investigation of Incident against Nur – one for "Trafficking" and one for "Possession." *Id.*; ECF 57-2 at 1; ECF 57-3 at 1. He also issued a Report of Conduct for the "Trafficking" charge. ECF 57-1 at 3; ECF 57-2 at 2. On September 22, 2020, Investigator McGee concluded his investigation and issued a Report of Conduct for the "Possession" charge. ECF 57-1 at 3; ECF 57-3 at 2.

On September 24, 2020, Nur received copies of the two Reports of Conduct for the "Trafficking" and "Possession" charges, along with two Notices of Disciplinary Hearing. ECF 57-2 at 2-3; ECF 57-3 at 2-3. For the "Possession" charge, Nur pleaded "not guilty" and requested: (1) a lay advocate; (2) "DVR" of the incident; (3) fingerprints and DNA testing from the phone; (4) a witness statement from an inmate named Whiteside; and (5) a photograph of his mattress. ECF 57-3 at 3. For the "Trafficking"

3

charge, Nur also pleaded "not guilty" and requested: (1) a lay advocate; (2) "DVR" of the incident; (3) fingerprints and DNA testing from the bag; and (4) a witness statement from Perez, the inmate who was accused of dropping off the bag. ECF 57-2 at 3.

On October 5, 2020, Nur was informed in writing by Screening Officer Carol Perkins that his request for certain evidence was denied because: (1) MCF did not have the capability to perform DNA testing or fingerprinting; (2) there were no pictures of the mattress taken; and (3) a statement from Whiteside could not be obtained because he no longer was incarcerated at MCF and was unable to be reached. ECF 57-2 at 4; ECF 57-3 at 4-6. Screening Officer Perkins did obtain a witness statement from Perez, who stated he was not connected to the laundry bag containing contraband and had carried a trash bag rather than a laundry bag into the staff shoeshine area. ECF 57-2 at 5. On October 7, 2020, Nur was informed in writing that his requests for "DVR" of the incident were denied for not being specific enough, as there were no cameras in the staff shoeshine area. ECF 57-2 at 6, 20; ECF 57-3 at 7.

On October 9, 2020, the disciplinary hearings for both the "Trafficking" and "Possession" charges were held by DHO Goodridge outside of Nur's cell in the segregated housing unit. ECF 54 at 37-38, 54. A lay advocate was present for both hearings. *Id.* Following the hearings, DHO Goodridge found Nur guilty on both charges. Regarding the "Possession" charge, DHO Goodridge issued a Report of Disciplinary Hearing noting that Nur alleged an inmate named Whiteside was responsible for possessing the cellphones, and that she found Nur guilty based on the staff reports and pictures. ECF 57-3 at 8. She imposed penalties of a loss of 180 credit

4

time days and a demotion of his credit class. *Id.* Regarding the "Trafficking" charge, DHO Goodridge issued a second Report of Disciplinary Hearing noting Nur claimed he never touched the bag with the contraband inside and finding him guilty based on the staff reports and pictures. ECF 57-2 at 8. She again imposed penalties of a loss of 180 credit time days and a demotion of his credit class. *Id.*

On October 10, 2020, Nur filed appeals for both the "Trafficking" and "Possession" charges. ECF 57-2 at 9; ECF 57-3 at 10. On October 21, 2020, while Nur's appeals were pending, he was moved to a different cell and was no longer housed in the administrative segregated housing unit. ECF 57-1 at 4.

On November 17, 2020, Warden Hyatte denied Nur's appeal regarding the "Trafficking" charge and noted Nur could still appeal that decision to the final reviewing authority. ECF 57-2 at 10. On November 24, 2020, Warden Hyatte denied Nur's appeal regarding the "Possession" charge. ECF 57-3 at 11. Nur appealed both decisions to the Central Office. ECF 54 at 45-46.

On December 28, 2020, the Central Office granted Nur's appeal for the "Possession" charge and vacated all sanctions that were previously imposed. ECF 57-3 at 13. On December 29, 2020, Nur's "Possession" charge was designated for a rehearing at MCF. *Id.* at 14. On January 21, 2021, following a new screening and rehearing before a new DHO, Nur was found "not guilty" of the "Possession" charge. ECF 54 at 46-49. All previous sanctions related to the "Possession" charge were vacated and never reimposed. *Id.* at 49-50.

5

On January 15, 2021, the Central Office denied Nur's appeal for the "Trafficking" charge. ECF 57-2 at 11. However, on July 29, 2021, after further review of his appeal, the Central Office granted Nur's appeal on the "Trafficking" charge and designated it for rehearing. *Id.* at 12.

On September 30, 2021, Nur underwent a second screening process in connection with the rehearing on the "Trafficking" disciplinary charge. ECF 57-2 at 15. This time, Nur requested that Investigator McGee be present for cross-examination. *Id.* Investigator McGee was not available for the hearing, so he provided written answers to the questions posed to him. ECF 57-1 at 4; ECF 57-2 at 18.

On November 23, 2021, the disciplinary rehearing for the "Trafficking" charge was held by a new DHO. ECF 57-2 at 24-25. Following the rehearing, Nur was again found guilty of the "Trafficking" charge. *Id.* at 24. The DHO issued a Report of Disciplinary Hearing, noting she found him guilty based on the "conduct report and pictures of evidence" and issuing penalties of a loss of 180 credit time days and a demotion of his credit class. *Id.* On November 24, 2021, Nur appealed his conviction for the "Trafficking" charge. ECF 57-2 at 26. On January 18, 2022, Warden Hyatte granted Nur's appeal of his "Trafficking" charge and vacated all of the previously imposed sanctions. *Id.* at 27. Because neither party disputes these facts, the court accepts them as undisputed.

The defendants argue summary judgment is warranted in their favor because: (1) Nur did not have a protected liberty interest at stake which afforded him due process protections; and, regardless, (2) Nur was afforded the due process protections

outlined by the Supreme Court in *Wolff v. McDonnell*, 418 U.S. 539 (1974). The defendants also argue they are entitled to qualified immunity for both of these reasons. The defendants' arguments will be addressed in turn.

### I.      Protected liberty interest

The Fourteenth Amendment provides state officials shall not "deprive any person of life, liberty, or property, without due process of law . . .." U.S. Const. amend. XIV, § 1. While "[t]he Constitution itself does not create an interest in avoiding transfer within a correctional facility," the Supreme Court has determined that "the Fourteenth Amendment provides to inmates a liberty interest in avoiding placement in more restrictive conditions, such as segregation, when those conditions pose an atypical and significant hardship when compared to the ordinary incidents of prison life." *Townsend v. Fuchs*, 522 F.3d 765, 771 (7th Cir. 2008) (citing *Sandin v. Conner*, 515 U.S. 472, 484–86 (1995)). The Seventh Circuit has previously concluded that inmates can have a liberty interest in avoiding placement in disciplinary segregation, but "have no liberty interest in avoiding transfer to *discretionary* segregation—that is, segregation imposed for administrative, protective, or investigative purposes." *Id.* (emphasis added) (citing *Lekas v. Briley*, 405 F.3d 602, 608–09 & 608 n.4 (7th Cir. 2005) ("[R]eassignment from the general population to discretionary segregation does not constitute a deprivation of a liberty interest."). This is because there is nothing "atypical" about discretionary segregation, which is "an 'ordinary incident of prison life' that inmates should expect to experience during their time in prison." *Id.*

Here, it is undisputed Nur was moved to the administrative segregated housing unit on August 13, 2020, pending the resolution of the investigation into the "Possession" and "Trafficking" charges, and was moved to a different cell and no longer housed in the administrative segregated housing unit on October 21, 2020, while his appeals were pending. ECF 57-1 at 3-4. The defendants argue that, because Nur was only held in discretionary segregation and was never held in disciplinary segregation, he never had any protected liberty interest. ECF 57 at 3-5. However, since the Seventh Circuit's decision in *Townsend*, recent cases have questioned the conclusion that placement in discretionary segregation can "*never* implicate a liberty interest." *See Williams v. Brown*, 849 Fed. Appx. 154, 157, n.3 (7th Cir. 2021) (emphasis added). Rather, courts have considered whether placement in discretionary segregation can create a protected liberty interest where the period of confinement is significant and the conditions in the cell are unusually harsh. *See e.g., Earl v. Racine County Jail*, 718 F.3d 689, 691 (7th Cir. 2013) ("When an inmate is placed in conditions more restrictive than those in the general prison population, whether through protective segregation like suicide watch or discretionary administrative segregation, his liberty is affected only if the more restrictive conditions are particularly harsh compared to ordinary prison life or if he remains subject to those conditions for a significantly long time."); *Isby v. Brown*, 856 F.3d 508, 524 (7th Cir. 2017) ("Prisoners do not have a constitutional right to remain in the general population, but both the duration *and* the conditions of the segregation must be considered in determining whether due process is implicated.") (internal quotation marks, parenthesis, and citations omitted; emphasis in original); *Marion v. Columbia*

8

*Correction Inst.*, 559 F.3d 693, 697-98 & nn.2–3 (7th Cir. 2009) ("[W]e have explained that a liberty interest may arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh."). Nur argues he had a protected liberty interest because the cell in which he was held in the administrative segregated housing unit had poor lighting and was "covered in excrement and other bodily fluids unable to be identified." ECF 64-1 at 4-5.

Here, it is a close call whether Nur had a protected liberty interest. However, the court does not need to answer this question, as it is clear from the record that the defendants are entitled to qualified immunity because it was not "clearly established" at the time of Nur's disciplinary hearings in 2020 that he had a protected liberty interest affording him due process protections.

"Qualified immunity protects government officials from civil liability when performing discretionary functions so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Alvarado v. Litscher*, 267 F.3d 648, 652 (7th Cir. 2001) (internal quotation marks and citation omitted). To overcome a qualified immunity defense, "a plaintiff must show the deprivation of a constitutional right, and must also show that the right was clearly established at the time of the violation." *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002) (citing *Alvarado*, 267 F.3d at 652). To show that a right is clearly established, the burden is on the plaintiff to "demonstrate that existing caselaw at the time of the events in question 'placed the statutory or constitutional question beyond debate.'" *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). A violation is only

9

clearly established where: (1) a closely analogous case establishes that the conduct is unconstitutional; or (2) the violation is so obvious that a reasonable state actor would know that his actions violated the Constitution. *Siebert v. Severino*, 256 F.3d 648, 654–55 (7th Cir. 2001). "[A] defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79 (2014).

In *Jackson v. Anastasio*, No. 23-1703, 2025 WL 2437947 (7th Cir. Aug. 25, 2025), the Seventh Circuit determined the defendants were entitled to qualified immunity under circumstances substantially similar to those here. Specifically, the plaintiff in *Jackson* alleged he was placed in disciplinary segregation for three months in a cell that, unlike the general population cells, "had feces and urine on the walls, constant noise with inmates banging on cell doors, water contaminated with bacteria that causes Legionnaire's disease, and roaches and mice." *Id.* at *3. The Court concluded Jackson had "raised a genuine issue of material fact as to whether" his confinement for three months in disciplinary segregation under the conditions he alleged was an "atypical or significant hardship in relation to the ordinary incidents of prison life" under *Sandin*. *Id.* at *7. However, the Court concluded that, even though there was a genuine dispute regarding whether Jackson had a protected liberty interest, the defendants were nevertheless entitled to qualified immunity because the plaintiff's right was not "clearly established" in March 2020. *Id.* at *8-10. Specifically, the Court concluded Jackson had not identified any caselaw showing it was "clearly established" in March 2020 that

10

housing an inmate in disciplinary segregation for three months with conditions like those alleged by Jackson created a protected liberty interest. *Id.* at *9-10. Rather, the court noted the jurisprudence regarding what presents "an atypical and significant hardship" is "not at all clear except at the fringes," and did not clearly establish in 2020 that housing an inmate in disciplinary segregation for three months with the conditions alleged by Jackson created a protected liberty interest. *Id.* at 9-10. The court concluded that, taking as true that Jackson "was subjected to three months in appalling conditions of solitary confinement," the defendants were entitled to qualified immunity because Jackson's right to due process protections was not clearly established at the time. *Id.*

Here, the Seventh Circuit in *Jackson* held it was not clearly established in March 2020 that housing an inmate in disciplinary segregation for three months in a cell that contained feces and urine on the walls created a protected liberty interest that implicated due process concerns. Similarly, Nur has not identified any caselaw showing it was clearly established at the time of his disciplinary proceedings in 2020 that housing an inmate in discretionary segregation for approximately 70 days in a cell with poor lighting and feces on the walls created a protected liberty interest implicating due process concerns. In fact, the law in Nur's case is even less "clearly established" than in *Jackson*, as the plaintiff in *Jackson* was housed in disciplinary segregation while Nur was only housed in discretionary segregation while his disciplinary charges were being investigated. While the Supreme Court concluded in 1995 that an inmate in disciplinary segregation could have a protected liberty interest under certain circumstances, the caselaw in 2020 was unclear whether inmates in discretionary segregation could *ever*

11

have a protected liberty interest. *See Williams*, 849 Fed. Appx. at 157, n.3 (noting that "some cases suggest that nonpunitive segregation can never implicate a liberty interest," but "more recent cases question that conclusion.").

In his summary judgment response, Nur acknowledges he does not have any "analogous cases" from 2020 showing the conditions he described created a protected liberty interest. Rather, he argues the constitutional violation was so obvious that a reasonable state actor would have known his actions violated the Constitution. *See* ECF 64-1 at 14-15. But the relevant caselaw at the time shows it was not "obvious" in 2020 that placing an inmate in discretionary segregation for 70 days in a cell with the conditions alleged by Nur created a protected liberty interest. Rather, the relevant caselaw from 2020 shows the jurisprudence regarding what duration and conditions were needed to create a protected liberty interest in an inmate's placement in disciplinary segregation was "not at all clear except at the fringes." *Jackson*, 2025 WL 2437947, at *9; *Obriecht v. Raemisch*, 565 F. App'x 535, 540 (7th Cir. 2014) (no liberty interest where defendant "submitted a declaration recounting deplorable conditions (in particular having to sleep on a mattress placed directly on the wet floor)" but was "released from segregation after only 78 days," as "[a] confinement of that length does not implicate a liberty interest"); *Whitfield v. Atchingson*, No. 13-cv-653-SMY-RJD, 2017 WL 3707180, at *5 (S.D. Ill. Aug. 28, 2017) (no liberty interest where disciplinary segregation lasted three months with conditions including a steel door, cellmates with mental health issues, unpleasant odors, constant noise, and other inmates throwing feces at him); *Lisle v. Welborn*, 933 F.3d 705 (7th Cir. 2019) (no liberty interest where

12

inmate was housed in a disciplinary segregation cell for four months with poor ventilation, rusty bars, corroded feces in the toilet, and inadequate cleaning supplies). And, as discussed, the caselaw was even less clear when dealing with discretionary segregation rather than disciplinary segregation. Thus, because it was not "clearly established" in 2020 that placing an inmate in discretionary segregation for 70 days in a cell with poor lighting and feces on the walls while his charges were being investigated created a protected liberty interest raising due process concerns, the defendants are entitled to qualified immunity on this claim. Summary judgment is warranted in favor of the defendants for this reason.

## II.    Due process protections under *Wolff*

Even assuming Nur had a protected liberty interest affording him due process protections that was "clearly established" at the time of his disciplinary hearings, summary judgment is alternatively warranted in favor of the defendants because they provided Nur with each of the due process protections afforded to him under *Wolff*.

In *Wolff*, the Supreme Court determined the Fourteenth Amendment guarantees prisoners the following procedural due process rights prior to being deprived of a protected interest through a prison disciplinary hearing: (1) advance written notice of the charges; (2) an opportunity to be heard before an impartial decision-maker; (3) an opportunity to call witnesses and present documentary evidence in defense, when consistent with institutional safety and correctional goals; and (4) a written statement by the fact-finder of evidence relied on and the reasons for the disciplinary action. *Wolff*, 418 U.S. at 563-73. Additionally, due process requires that before an inmate is deprived

of a protected interest, there must be "some evidence" in the record to support the deprivation. *Superintendent, Mass Corr. Inst. v. Hill*, 472 U.S. 445, 455 (1985).

The record shows the defendants provided Nur each of the due process protections afforded to him under *Wolff*. First, due process entitled Nur to advanced written notice of the charges against him at least 24 hours before his disciplinary hearings to inform him of the charges and enable him to prepare a defense. *See Wolff*, 418 U.S. at 564. Here, it is undisputed Nur received conduct reports and hearing notices detailing both the "Trafficking" and "Possession" charges against him around September 24, 2020, signed the notices and requested evidence on that same day, and his hearings were held over two weeks later on October 9, 2020. ECF 54 at 29, 50-52; ECF 57-2 at 2-3; ECF 57-3 at 2-3. In his response, Nur argues he was not informed of the charges against him prior to being placed in the administrative segregated housing unit. ECF 64-1 at 9. This is true, as Nur was moved into the administrative segregated housing unit on August 13, and did not receive the written notices until September 24. But *Wolff* only provides that Nur needed to be given written notice of the charges against him at least 24 hours before his *hearing*, not before his transfer to the administrative segregated housing unit. *See Wolff*, 418 U.S. at 564. It is undisputed Nur received written notices informing him of the charges against him well in advance of his hearings, and Nur provides no authority indicating due process required he be given written notice of the charges against him before he was moved into the administrative segregated housing unit. Thus, Nur has not shown the defendants violated his due process rights by denying him advanced written notice of the charges against him.

14

Second, due process entitled Nur an opportunity to be heard before an impartial decision maker. *See Wolff*, 418 U.S. at 571. Hearing officers "are entitled to a presumption of honesty and integrity" absent clear evidence to the contrary. *Piggie v. Cotton*, 342 F.3d 660, 666 (7th Cir. 2003); *see Perotti v. Marberry*, 355 F. App'x 39, 43 (7th Cir. 2009) (*citing Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). "[T]he constitutional standard for impermissible bias is high." *Piggie*, 342 F.3d at 666. The presumption is overcome—and an inmate's right to an impartial decision-maker is breached—in rare cases, such as when the hearing officer has been "directly or substantially involved in the factual events underlying the disciplinary charges, or in the investigation thereof." *Id*. at 667.

Here, it is undisputed Nur's disciplinary charges were screened by Ms. Perkins, his disciplinary hearings were conducted by DHO Goodridge, and his appeals were considered by Warden Hyatte. ECF 57-2 at 3, 8, 10; ECF 57-3 at 3, 8, 11. There is no evidence that any of these three parties had any involvement in the underlying incidents on August 12, 2020, or the investigation that followed. Nur argues that DHO Goodridge was not an impartial decision maker because she refused to provide the video evidence he requested (ECF 64-1 at 9), but it is undisputed DHO Goodridge informed Nur in advance of the hearings that his request for video footage was too vague because there was no camera in the shoeshine area. ECF 57-2 at 6. Nur does not dispute that there was no camera in the shoeshine area, and there is no evidence he ever requested any other video footage from DHO Goodridge after she informed him his request was too vague. Nur also argues DHO Goodridge was not an impartial decision maker because she did not call McGee as a witness at the hearing (ECF 64-1 at 9-10), but

15

it is undisputed Nur did not list McGee as a potential witness or otherwise request any testimony from him in advance of the hearing.[1] Because Nur was given an opportunity at the screening stage to list the witnesses he wished to call at the hearing and did not list McGee as a potential witness, DHO Goodridge did not show "impermissible bias" by deciding not to call McGee as a witness at the hearing. ECF 57-2 at 3; ECF 57-3 at 3. Screening Officer Perkins, DHO Goodridge, and Warden Hyatte are "entitled to a presumption of honesty and integrity absent clear evidence to the contrary," and Nur has not designated any such evidence showing these parties were impartial. *See Piggie*, 342 F.3d at 666. Thus, Nur has not shown the defendants violated his due process rights by denying him an opportunity to be heard before an impartial decision maker.

Third, due process entitled Nur to an opportunity to call witnesses and present evidence at his hearings. *See Wolff*, 418 U.S. at 566-69. Here, Nur requested for his hearings: (1) a lay advocate; (2) "DVR" of in the incident, (3) fingerprints and DNA testing from the phone and bag; (4) a witness statement from Whiteside; (5) a witness statement from Perez; and (6) a photograph of his mattress. ECF 57-2 at 2; ECF 57-3 at 2. Nur was provided with a lay advocate and a witness statement from Perez, and it is undisputed the defendants notified Nur in writing in advance of his hearings that the remaining evidence he requested was not available because (1) his request for "DVR" was too vague because there was no camera in the shoeshine area, (2) there were no pictures of his mattress taken, (3) a statement from Whiteside could not be obtained

---

[1] Nur concedes he did not list McGee as a potential witness in advance of the hearing because he feared reprisal and did not want to give McGee more time to fabricate evidence against him. ECF 64-1 at 11.

16

because he no longer was incarcerated at MCF and could not be reached, and (4) MCF did not have the capability to perform DNA testing or fingerprinting. ECF 57-2 at 4-7; ECF 57-3 at 4-7. Thus, the undisputed evidence shows Nur was informed in advance of his hearings that some of the evidence he requested was unavailable, and the defendants provided Nur with all of the evidence he requested that they were capable of providing. Nur does not dispute any of the reasons he was provided for the evidence he requested being unavailable. He suggests video evidence would have been exculpatory (ECF 64-1 at 11), but he does not dispute there was no camera in the shoeshine area and does not explain what other video evidence would have been relevant. Nur also argues he should have been allowed to call McGee as a witness at the hearing (ECF 64-1 at 11), but as discussed he did not list McGee as a potential witness during the screening process. Because the undisputed evidence shows the defendants notified Nur in advance of his hearings that some of the evidence he requested was unavailable, and provided Nur with all the evidence and witness testimony he requested that they were capable of providing, Nur has not shown the defendants violated his due process rights by denying him the opportunity to call witnesses or present evidence at his hearings.

Fourth, due process entitled Nur to a written statement from DHO Goodridge of the evidence she relied upon and the reasons for her disciplinary actions. *See Wolff*, 418 U.S. at 564-65. It is undisputed DHO Goodridge provided Nur with two Reports of Disciplinary Hearing, which informed Nur that DHO Goodridge found him guilty of both the "Possession" and "Trafficking" charges based on the "staff reports" and

17

"pictures." ECF 57-2 at 8; ECF 57-3 at 8. Nur argues these reports are "disputed" because the evidence she relied upon was either illegally obtained or fabricated. ECF 64-1 at 12. But, while Nur contests the contents of DHO Goodridge's written statements, he does not dispute DHO Goodridge provided him with written statements informing him of the evidence she relied upon and the reasons for the disciplinary actions for both of his hearings. There is no evidence these written statements were inadequate or otherwise violated Nur's due process rights. Therefore, Nur has not shown the defendants violated his due process rights by denying him a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action.

Lastly, to satisfy due process, there must be "some evidence" in the record to support the guilty findings. *Hill*, 472 U.S. at 454. In the context of a prison disciplinary hearing, "the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board." *Id.* at 455-56 (emphasis added); *see also Eichwedel v. Chandler*, 696 F.3d 660, 675 (7th Cir. 2012) ("The 'some evidence' standard . . . is satisfied if there is any evidence in the record that could support the conclusion reached by the disciplinary board."). The "some evidence" standard is "a 'meager threshold.'" *Jones v. Cross*, 637 F.3d 841, 849 (7th Cir. 2011) (*quoting Scruggs v. Jordan*, 485 F.3d 934, 939 (7th Cir. 2007)). Once the Court finds "some evidence" supporting the disciplinary conviction, the inquiry ends. *Id*. This Court may not "reweigh the evidence underlying the hearing officer's decision" or "look to see if other record evidence supports a contrary finding." *Rhoiney v. Neal*, 723 F. App'x 347, 348 (7th Cir. 2018) (*citing Webb v. Anderson*, 224 F.3d 649, 652 (7th Cir. 2000)).

Here, it is undisputed DHO Goodridge found Nur guilty of the "Trafficking" and "Possession" charges based on the "staff reports" and "pictures." ECF 57-2 at 8; ECF 57-3 at 8. This includes McGee's report stating he witnessed Perez leave a laundry bag next to Nur that contained tobacco and cell phones, McGee's report stating he found an additional cell phone in Nur's mattress, and photographs of the laundry bag, cellphones, and other contraband. ECF 57-2 at 1-2, 28; ECF 57-3 at 1-2. This easily satisfies the "some evidence" standard for both the "Trafficking" and the "Possession" charges. *See Jones*, 637 F.3d at 849. Nur argues repeatedly that this evidence was all fabricated by McGee, but the court cannot reweigh the evidence at this stage. *See Rhoiney*, 723 F. App'x at 348. Because the staff reports and pictures satisfy the meager "some evidence" standard, Nur has not shown his due process rights were violated because there was inadequate evidence to support the guilty finding. Therefore, the undisputed facts show Nur was afforded each of the due process protections afforded to him under *Wolff*.

### III. Conclusion

Accordingly, the undisputed facts show the defendants are entitled to qualified immunity because it was not "clearly established" at the time of Nur's disciplinary hearings in 2020 that he had a protected liberty interest affording him due process protections. Alternatively, even assuming Nur had a protected liberty interest affording him due process protections that was "clearly established" in 2020, summary judgment remains appropriate for the defendants because the undisputed facts show the defendants provided Nur each of the due process protections afforded to him under

*Wolff.* For both of these reasons, summary judgment is warranted in favor of the defendants.

For these reasons, the court:

(1) GRANTS the defendants' motion for summary judgment (ECF 56); and

(2) DIRECTS the clerk to enter judgment in favor of the defendants and against Mustafa Nur and to close this case.

SO ORDERED on September 22, 2025

/s/JON E. DEGUILIO  
JUDGE  
UNITED STATES DISTRICT COURT